[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 789 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 790 
On April 22, 1993, then Governor Guy Hunt was convicted of violating Alabama ethics laws.[1] As a result of those convictions, Governor Hunt was immediately removed from office and Lieutenant Governor Jim Folsom, Jr., was sworn in as Alabama's governor. Because of these unusual circumstances, "time was of the essence" when the new governor assembled his cabinet and his administrative staff.
Without the usual benefit of the time between a general election and an inauguration, Governor Folsom made numerous appointments. On May 6, 1993, he appointed James Heywood Dill to the position of Alabama insurance commissioner, a position Dill held until Governor Folsom's term ended in January 1995. At the time of his appointment, Dill was president of a family-owned insurance company, Jadil, Inc. Jadil accepted his resignation on June 1, 1993. Controversy arose regarding Dill's failure to divest himself from the company prior to his appointment as insurance commissioner. On June 14, 1996, following an investigation and hearing by the Alabama Ethics Commission, Dill was indicted on two counts of violating the Code of Ethics for Public Officials (§ 36-21-1 *Page 791 
et seq., Ala. Code 1975) and two counts of perjury in connection with the hearing before the Ethics Commission.
Count I charged Dill with knowingly and willfully associating with a business he regulated as insurance commissioner, a violation of § 36-25-9, Ala. Code 1975, a section of the Alabama Code of Ethics for Public Officials (the "Ethics Act"), Ala. Code 1975, § 36-21-1 to -30. Count II charged Dill with knowingly and willfully accepting something of value from a person associated with a business that he regulated, a violation of § 36-25-12, Ala. Code 1975. In Counts III and IV, Dill was charged with perjury in the first degree, a violation of §13A-10-101, Ala. Code 1975.
Dill was convicted on all four counts. He was sentenced to four years in prison on each count, and the sentences were to be served concurrently. Pursuant to the Split Sentence Act, his sentences were suspended and he was ordered to serve six months in prison followed by two years' probation. He was also ordered to pay a fine of $5,000, and to perform 200 hours of community service.
These indictments resulted from a unique and complicated fact situation. Consequently, a lengthy recitation of the facts is essential to an understanding of this case.
Governor Folsom first contacted Dill on May 1, 1993, and informed Dill that he was considering appointing him to the position of Alabama insurance commissioner. That same day, Dill flew from a convention he was attending in Florida to Montgomery in order to meet with Governor Folsom's transition team. Dill flew back to Florida after this meeting and returned to his Birmingham home on May 2. On May 3, Governor Folsom met with Dill in Montgomery. At that meeting, Governor Folsom asked Dill if he would be interested in an appointment to the position of insurance commissioner, and Dill accepted the position. On May 5, Dill returned to Montgomery for a press conference, at which Governor Folsom announced that Dill was assuming the position of insurance commissioner. There was no swearing-in ceremony. Dill immediately began performing his duties as commissioner, commuting from Birmingham while searching for a place to live in Montgomery. Dill was also still president of Jadil, Inc., an insurance company that he had established in 1991.
Upon learning of his appointment, Dill contacted his tax attorney John Cooper, a member of a prominent Birmingham law firm, in an attempt to determine the steps he should take in order to sever his ties with Jadil. Cooper then contacted James Anderson, an ethics lawyer and former chairman of the Ethics Commission. Anderson telephoned the Ethics Commission and was instructed to draft an advisory opinion request and to submit the request to the Commission before the next meeting of the Commission, which was on May 26, 1993.
On May 11, 1993, Dill's tax attorney, John Cooper; the lawyer responsible for Dill's estate planning, Judith Todd; and Dill's Certified Public Accountant, Gerald Rowe, met to discuss various options by which Dill would sever his ties with Jadil and, if possible, would receive money upon his withdrawal from the company. Dill was deeply in debt and his acceptance of the position of insurance commissioner meant a decrease in his annual income. It was undisputed that Dill was aware that his lawyers and accountant were working to secure a financial package as part of his severance from Jadil.
At the May 11 meeting, a deferred compensation agreement was proposed. However, a telephone call to James Anderson revealed that this plan would not work under the Ethics Act. Also discussed was the fact that, under the Ethics Act, Dill could no longer serve as the trustee of an irrevocable trust that had been set up in April (before Dill's appointment) because this trust was to hold Jadil stock as its corpus. Therefore, this trust was terminated. (R. 348.)
On May 18, 1993, Rowe, Todd, and Cooper met again to develop ways to divest Dill from Jadil and to try to provide him with some income. (R. 356.) They discussed the possibility of Dill's daughter, Beeland Dill, obtaining a loan for $175,000 from a bank and purchasing the Jadil stock from Dill's mother, Catherine Dill.[2] Catherine Dill would then *Page 792 
lend Jimmy Dill $150,000. (R. 357.) (This plan, however, was never carried out because of unfavorable tax consequences to Catherine Dill. Instead, Catherine Dill gave the stock to Beeland.) At the May 18 meeting, Rowe, Todd, and Cooper also placed a conference call to Shannon Dye, a loan officer at First Alabama Bank. Todd informed her that Beeland might want to borrow $175,000 to buy Jadil stock. (R. 360-361, 387-392.)
On May 20, 1993, Dill placed a telephone call to Shannon Dye, who was Jadil's loan officer at the bank, informing Dye of his appointment as insurance commissioner and informing her that this appointment required him to sever all ties with Jadil. Dill also informed Dye that Beeland Dill was taking over Jadil and might need to borrow $175,000 to purchase Jadil stock.
On May 24, 1993, James Anderson sent a letter to the Ethics Commission. The letter read as follows:
 "This letter is to request an advisory opinion as it relates to the newly appointed Insurance Commissioner, James Dill. Mr. Dill realizes he needs to sever his association with J. Dill, Inc. [sic], as it is a business that he would be regulating. In order to comply with § 36-25-9 and the provisions in the Code of Alabama dealing with the Department of Insurance, Mr. Dill has an Agreement which would sever any and all financial ties with J. Dill, Inc. [sic].
 "The Agreement is basically as follows: Monies will be paid in a lump sum to Commissioner Dill and he would no longer be associated with that business as set out in § 36-25-1 (2). Commissioner Dill, in fact, will own no interest in the ongoing business J. Dill, Inc. [sic] and the ownership of the company will vest in Commissioner Dill's daughter who is an adult and not a dependent as defined in § 36-25-1 (10).
 "The Commissioner asks for this advisory opinion in an abundance of caution so as to make it dear although the business will continue with the same name, there will be no connection which would create any conflict of interest."
(State's Exhibit 4.) Anderson testified that he never spoke to Dill before he contacted the Ethics Commission for advice regarding Dill's situation and further testified that he had gotten all of his information regarding Dill from John Cooper. (R. 281.) There was no evidence that Dill ever received a copy of Anderson's letter to the Commission.
On May 26, 1993, the Ethics Commission issued an advisory opinion stating that a lump-sum payment from Jadil to Dill as part of Dill's severance agreement would not violate the Ethics Act. The Commission's response, however, implies that it understood that Dill had an ownership interest in Jadil, when, in fact, although Dill started the company and ran the company, Dill's mother, Catherine Dill, owned all of the Jadil stock. The Advisory Opinion stated:
"FACTS:
 "The newly appointed Commissioner of Insurance has a major financial interest in an insurance company. He is aware that in his new position, he must sever his association with his company since his department is directly responsible for regulating insurance companies in Alabama.
 "As part of the severance agreement, his company will pay him a lump sum settlement of all monies due him. At that point, the Insurance Commissioner will no longer own any interest in the insurance company. His interest will be transferred to his adult daughter who is not a dependent as defined in Section 36-25-1 (12) Code of Alabama, 1975 (The Ethics Law) which reads as follows:
"36-25-1 (12)
 "PUBLIC OFFICIAL'S FAMILY. The official's spouse and dependents.
 "QUESTION: "Does the above arrangement remove any possible conflict with the Alabama Ethics Law?
 "OPINION: "Yes. The Alabama Ethics Commission rules that in severing all connections with his former insurance company, he avoids *Page 793 
any conflicts of interests with Sections 36-25-5 (a) and 36-25-9 of the Ethics law which read as follows:
"36-25-5 (a)
 "No public official or employee shall use an official position or office to obtain direct personal financial gain for himself, or his family, or any business with which he or a member of his family is associated unless such use and gain are specifically authorized by law.
"36-25-9
 "Unless expressly provided otherwise by law, no person shall serve as a member or employee of a state, county, or municipal regulatory board or commission or other body that regulates any business with which he is associated.
 "Since the adult daughter of the Insurance Commissioner now controls his previous interest in the insurance company, the Alabama Ethics Commission recommends that he abstain from any decision made by his department which affect his former company any differently than the insurance industry as a whole."
"AUTHORITY:
 "Vote of the Commission on May 26, 1993."
(State's Exhibit 6.) This opinion never affirmatively states that Dill owns Jadil, but states that Dill "will no longer own any interest in the insurance company" after severing his ties with the company. There was no evidence that Dill ever received a copy of this opinion. However, there is evidence to support the conclusion that he was advised of the crux of its ruling.
Dill continued to serve as Jadil's president until Jadil officially accepted his resignation on June 1. On May 20, Dill telephoned Shannon Dye, Jadil's loan officer at First Alabama Bank. The State argued that during this telephone call, Dill used his influence as insurance commissioner to secure a $175,000 loan to Beeland from First Alabama Bank, and that he subsequently arranged for Beeland to transfer this money to him, rather than for her to use it to purchase Jadil stock from her grandmother. However, Dye herself disputed the State's interpretation of her telephone conversation with Jimmy Dill.[3]
On May 27, Dill wrote himself a bonus check on Jadil's account for $10,000. This amount was treated as a loan on Jadil's books. (R. 468, 662.) On May 31, Dill fired longtime Jadil employee Beverly Butler and also wrote himself a payroll check on Jadil's account for $1,895. During the month of June, Jadil discharged approximately $128,000 of debt owed by Dill to Jadil in exchange for Dill's transfer to Jadil of his interests in certain partnerships that owned real property and had accounts receivable. On July 2, Jadil paid $35,000 directly to the Internal Revenue Service on Dill's behalf, which according to Gerald Rowe, Dill's accountant, was payment of income taxes on Dill's salary for Dill's services to Jadil from January 1993 to May 31, 1993.
Gerald Rowe testified that in late May or early June, he told Beeland that her father needed $175,000 to liquidate his debts. Rowe suggested to Beeland that she contact Shannon Dye at First Alabama Bank about securing a $175,000 loan. Beeland did so and obtained a $175,000 loan, using the Jadil stock that her grandmother had given to her *Page 794 
as collateral. On June 16 or 17, 1993, Dill received a $175,000 check from Beeland Dill. In the bottom left-hand corner of the check, Beeland had written "love gift."[4]
Dill served as insurance commissioner from May 5, 1993, to January 1995. (R. 109.) On June 14, 1996, Dill was indicted for maintaining his association with Jadil while serving as insurance commissioner and for accepting $175,000 from Jadil while serving as insurance commissioner. He was also indicted for perjury based on his statements at a hearing before the Ethics Commission that he had no prior knowledge that Beeland was giving him the $175,000 and that he "had no party to the deal."[5] (C. 5-6, 289.) Following a jury trial, Dill was convicted on all four counts.
Dill appeals his convictions.
 I
Dill contends that the State failed to prove that he had the criminal intent necessary to violate the Ethics Act, i.e., that it failed to prove that he knowingly and willfully associated with a business he regulated as insurance commissioner. Dill argues that he attempted in good faith to comply with the Ethics Act and the advisory opinion issued by the Ethics Commission by removing himself from Jadil as quickly as possible without destroying Jadil in the process. The State asserts that Dill knowingly and willfully failed to sever himself from Jadil promptly and cleanly and that, in failing to do so, he violated § 36-25-9, Ala. Code 1975. Section 36-25-9 (a), Ala. Code 1975, provides:
 "Unless expressly provided otherwise by law, no person "shall serve as a member or employee of a state, county "or municipal regulatory board or commission or other "body that regulates any business with which he is "associated."
(Emphasis added.)
In addition to claiming that the State failed to show that he possessed the requisite criminal intent, Dill contends that Count I of the indictment, which charged him with being associated with a business that he regulated as insurance commissioner, is barred by the statute of limitations.
Dill was indicted on June 14, 1996. The statute of limitations in this case runs from June 14, 1993, to June 14, 1996. §15-3-1, Ala. Code 1975.[6] Thus, any conduct occurring before June 14, 1993, is barred by the three-year statute of limitations. See Hunt v. State, 642 So.2d 999, 1018 (Ala.Cr.App. 1993).
The State argues that Dill's resignation from Jadil on June 1 was merely a resignation on paper. As evidence, the State points to Dill's activities in May to show a pattern of association with the company: (1) his firing Jadil employee Beverly Butler on May 31, 1993; and (2) his writing checks on behalf of Jadil, including a $10,000 bonus check to himself, during the month of May. These activities in May, however, fall outside of the limitations period. Any charges based upon Dill's conduct prior to June 14, 1993, are barred by the applicable statute of limitations.
A conviction on Count I could properly be based only upon Dill's associating with Jadil, within the meaning of §36-25-9, on or after June 14, 1993. The State presented the following evidence of activities by Dill that it contends supports the finding that Dill associated with Jadil after June 14:(1) Dill's receipt of $175,000 from Beeland on June 16 or 17; (2) Jadil's payment of $35,000 to the Internal Revenue Service on Dill's behalf on July 2, 1993, which according to Gerald Rowe was payment of income taxes on Dill's salary for Dill's services to Jadil from January 1993 to May 31, 1993; and (3) Jadil's June discharge of approximately $128,000 of debt *Page 795 
owed by Dill to Jadil in exchange for Dill's transfer to Jadil of his interests in certain partnerships that owned real property and had accounts receivable.
None of these activities in June, however, fall within the applicable statutory definition of associating with a business:
 "BUSINESS WITH WHICH HE IS ASSOCIATED. Any business of which the person or a member of his family is an officer, owner, partner, employee or holder of more than 10 percent of the fair market value of such business."
§ 36-25-1 (2), Ala. Code 1975. The State must prove that Dill "or a member of his family is an officer, owner, partner, employee or holder of more than 10 percent of [Jadil's] fair market value."
To determine whether Dill was "associated" with Jadil during the time he was insurance commissioner, as charged in Count I, we must first ask whether Dill himself was "an officer, owner, partner, employee or holder of more than 10 percent of [Jadil's] fair market value" on or after June 14, 1993. Although the State asserts that Dill's receipt of the $176,000 check, Jadil's payment of Dill's $35,000 income tax liability, and Jadil's discharge of Dill's $128,000 debt evidence Dill's association with Jadil, the State failed to prove that following June 14, 1993, Dill was involved with Jadil in any way that falls within the narrow statutory definition set out in § 35-25-1 (2), Ala. Code 1975, i.e., that he was "an officer, owner, partner, employee or holder of more than 10 percent of [Jadil's] fair market value." Jadil accepted Dill's resignation on June 1, 1993. The State presented no evidence that, after that date, Dill made any management decision, performed any duties as company president, or acted in any way as an employee of Jadil. Nor did the State present any evidence that Dill owned any interest in Jadil.
Beeland became the owner and sole shareholder of Jadil while Dill served as insurance commissioner. Beeland, who is not a dependent, does not fall within the statutory definition of "family" in effect at the time Dill was insurance commissioner. "Family" was then defined in § 35-25-1 (12), Ala. Code 1975, as the public official's "spouse and dependents." Dill's adult daughter Beeland did not come within this definition.[7] Thus, we conclude that the State has not presented evidence that, within the statutory period of limitations, Dill knowingly and willfully" associated" with a business he regulated as insurance commissioner. Therefore, Dill's conviction for violating §36-25-9, Ala. Code 1975, as charged in Count One of the indictment, is due to be reversed and a judgment rendered in his favor on that count.
Obviously, when a governor is making an appointment to fill a position such as insurance commissioner, someone experienced in the business or industry the position regulates is desirable. We do not wish to encourage future public officials to be dilatory in divesting themselves of interests similar to Dill's. The wisest course of action would have been for Dill not to have accepted the appointment before he completely divested himself from Jadil. Nevertheless, based upon the evidence, we can only conclude that the State failed to prove that Dill knowingly and willfully "associated" with a business he regulated as insurance commissioner within the statutory period of limitations.
 II
Dill contends that the State failed to present sufficient evidence to support his conviction on Count II for knowingly and willfully soliciting or accepting a $175,000 check from Beeland Dill, a person associated with a business that Dill regulated as insurance commissioner, in violation of § 36-25-12, Ala. Code 1975. At the time Dill was insurance commissioner, § 36-25-12
provided, in pertinent part:[8]
 "No person shall offer or give to a member or employee of a governmental agency, *Page 796 
board or commission that regulates a business with which such person is associated, and no member or employee of a governmental regulatory agency, board, or commission shall solicit or accept from any such person anything of value including a promise of future employment or a favor or service while the member or employee is associated with the regulatory agency, board, or commission."
When reviewing the sufficiency of the evidence to sustain a conviction,
 "`. . . a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution. Faircloth v. State, 471 So.2d 485
(Ala.Cr.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). Furthermore, a judgment of conviction will not be set aside on the ground of insufficiency of the evidence unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the judgment is so decided as to clearly convince the reviewing court that it was wrong and unjust. Jackson v. State, 516 So.2d 726 (Ala.Cr.App. 1985).'"
Burell v. State, 680 So.2d 975, 977 (Ala.Cr.App. 1996), quotingPowe v. State, 597 So.2d 721, 724 (Ala. 1992). Circumstantial evidence will be given the same weight as direct evidence "provided it points to the guilt of the accused." Minnis v.State, 690 So.2d 521, 523 (Ala.Cr.App. 1996). Although this Court will not substitute its judgment for that of the jury, "our obligation is to determine if there exists any reasonable theory from which the jury could have concluded that the defendant was guilty of the crime charged." Id. "When guilt is predicated upon circumstantial evidence, the test to be applied is whether a jury might reasonably conclude that the evidence excludes every reasonable hypothesis but that of guilt." Ashurst v. State,462 So.2d 999, 1003 (Ala.Cr.App. 1984).
Could the jury have reasonably concluded in this factually convoluted case that the evidence excludes every reasonable hypothesis but guilt? Was Dill's receipt of the $175,000, in and of itself, a violation of § 36-25-12, Ala. Code 1975? The answer to both these questions has to be no.
The crucial inquiry is not whether Dill received something of value from a company which he regulated, but whether he did so knowingly and willfully, so as to violate § 36-25-12, Ala. Code 1975. Section 36-25-12 does not create a strict liability offense. See Chandler v. State, 615 So.2d 100, 108
(Ala.Cr.App. 1992).
If this were a strict liability offense, Dill would have been in violation of the Ethics Act the moment then Governor Folsom appointed him insurance commissioner. However, this is not a strict liability offense. In order to prove that Dill possessed criminal intent, the State must show that Dill "knowingly and/or willfully" violated the Ethics Act. See § 36-25-27, Ala. Code 1975.
 "A person acts knowingly with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of that nature or that circumstance exists."
§ 13A-2-2, Ala. Code 1975. A person acts "willfully" when he acts intentionally and purposely without justifiable excuse. Id.
"`Intent, . . . being a state or condition of the mind is rarely, if ever, susceptible of direct or positive proof, and must usually be inferred from the facts testified to by witnesses and the circumstances as developed by the evidence.' Pumphrey v.State, 156 Ala. 103, 47 So. 156, 157 (1908).'" Hodges v. State,570 So.2d 1252, 1254 (Ala.Cr.App. 1989), quoting McCord v. State,501 So.2d 520, 528-29 (Ala.Cr.App. 1986). "This court will not disturb a verdict of conviction on the grounds of insufficiency of the evidence, `unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust.'" Sales v. State, 435 So.2d 242, 246
(Ala.Cr.App. 1983), quoting Johnson v. State, 378 So.2d 1164
(Ala.Cr.App. 1979). Applying this test to the present case, we are so convinced that the verdict in this case was wrong and unjust.
Although intent may be proved by circumstantial evidence and must often "be *Page 797 
determined by necessity by subjective inferences, those inferences must be substantial." McArdle v. State, 372 So.2d 897,901 (Ala.Cr.App.), cert. denied, 372 So.2d 902 (Ala. 1979). The State's evidence of criminal intent, as set out below, is insufficient to support a finding that Dill knowingly and/or willfully violated the Ethics Act. "A conviction may not rest on speculation." McArdle. 372 So.2d at 901.
After a thorough examination of the State's evidence, we find that Shannon Dye presented the most significant testimony for the State. Dill's conversation with Dye is at the heart of the State's argument that Dill used his influence as insurance commissioner to secure from First Alabama Bank a $175,000 loan to Beeland, and then arranged for Beeland to transfer that money to him, knowingly and willfully violating § 36-25-12, Ala. Code 1975. However, Dye's testimony does not support the State's theory. Shannon Dye testified as follows:
 "[Dye]: The conversation was with Jimmy. He was going to be appointed insurance commissioner or had been appointed insurance commissioner. He was not allowed as insurance commissioner to have any relationship with any companies in the state that were dealing with insurance.
"[The State]: Where did you get that information?
 "[Dye]: This was from Jimmy. He had called me and told me he was having to make a clean break with any companies.
 "[The State]: What else did he tell you in that conversation?
 "[Dye]: According to my notes Beeland was going to be running the company. She had had some experience in insurance before. Jimmy was totally out. He would not be able to guarantee any of the debt. His name would not be able to be on any of the notes. Beeland would become a guarantor rather than Jimmy. The notes that we had in place would stay for the company.
"[The State]: You already had some notes?
"[Dye]: Yes, ma`am.
"[The State]: For Jadil?
"[Dye]: Yes, ma`am .
 "[The State]: That's the company you are referring to?
"[Dye]: Yes, ma`am.
 "[The State]: What kind of notes were those?
 "[Dye]: I believe we had a car note and just a line of credit for the company.
 "[The State]: Before I interrupted you, I think you were going through the conversation.
 "[Dye]: Basically going through my list of notes here. We were going to do a loan to Beeland to buy the stock of the company. She would be running the company, and the stock would be pledged as collateral behind that note.
"[The State]: Was there any other collateral?
 "[Dye]: We had looked at accounts receivable. It was an insurance company, so they did not have accounts receivable.
 "[The State]: What was the amount of the loan you and Mr. Dill were talking about?
"[Dye]: We did a $170,000 note to Beeland.
 "[The State]: Is there any amount reflected on your note, State's Exhibit # 3?
"[Dye]: I have it down here as $175,000.
 "[The State]: What was the purpose of the loan?
 "[Dye]: I believe that Beeland was going to buy the stock of the company. Her grandmother owned the stock.
 "[The State]: There is a note at the top, `Jim Martin's townhouse on the basis of appeal.' What did that have to do with this?
 "[Dye]: That was just where Jimmy was going to be living in Montgomery. With the change in the government, he was going to be living in Jim Martin's townhouse. He thought during the appeal between when the government went out and the government came in, he didn't know whether he would be there.
 "[The State]: Why was it important to know where he was living?
 "[Dye]: If I needed to get in touch with him for any reason. *Page 798 
 "[The State]: Have we covered now that note, those notes at that time?
"[Dye]: Yes, ma`am.
 "[The State]: Now, you didn't issue the note that day, did you?
"[Dye]: No, ma`am.
 "[The State]: If the note was going to be in Beeland's name, what did you do next?
 "[Dye]: I talked to Beeland. I wanted some information, and got a personal financial statement from Beeland, made sure we had that. And then we structured the note and had it set up for her to come in and sign the loan agreement.
 "[The State]: I forgot to ask you, so forgive me. We mentioned some of those are in pencil. Can you tell the jury which of the notes on State's Exhibit 3 are in pencil?
 "[Dye]: The ones, if you will look to the side, that are written slanted, Jerry Rowe and his telephone number, Jimmy's salary.
". . . .
 "[The State]: You mentioned you had a conversation with Beeland Dill, the defendant's daughter. Do your notes reflect — do your records reflect when that was?
 "[Dye]: There was a call report that I wrote up for the file. I don't know if it is in here or not. It was dated May 25, 1993 when I talked to Beeland.
 "[The State]: So it was some five days after the conversation with Jimmy Dill?
"[Dye]: Yes, ma`am.
 "[The State]: What was the substance of the conversation?
 "[Dye]: Jimmy was appointed insurance commissioner and would have to divest himself of any control or ownership of the business, of the company. Beeland was his daughter, had five years experience in the busines, would be buying the company with an agreement in place that allows Jimmy to buy back into the company if he decides to leave. We had been requested to review the information provided to finance the buy-out.
". . . .
 "[The State]: And you mentioned something about an agreement?
 "[Dye]: I am not sure if the agreement was actually in place. I didn't see one. . . . There was really not anything assumed at that point in time. We were just talking about what would happen if the government, the State government had changed and other people came back in, would Jimmy have a job, or would he have to find some other place to work.
 "[The State]: And in this conversation, the understanding was that he would be allowed to buy back into the company or assume management control?
 "[Dye]: That was my understanding, yes, ma`am."
(R. 149-158.) When asked if Dill ever "suggested that you give Beeland Dill any money when you talked to him on May 20?" Dye replied, "I don't believe so." Dye also testified that she "[did not] remember who actually asked about the loan itself and the amount." (R. 172-76.) Dye did not have any further conversations with Dill regarding a loan to Beeland.
On June 15, 1993, Beeland did receive a $175,000 loan from First Alabama Bank, in the form of a cashier's check. (R. 166-67.) The State asserts that Dye must have loaned the money to Beeland based on Dill's position as insurance commissioner because, it argues, Beeland's net worth was only $10,686. We note, however, that Beeland Dill owned Jadil and had been given by her grandmother all 550 shares in the company valued at approximately $70,000. Jadil stock and the dividends from that stock were pledged at security for the loan. The State wholly failed to prove that Beeland's receipt of this loan and, ultimately, Dill's receipt of this money, was connected to Dill's position as insurance commissioner. During cross-examination, Shannon Dye testified that although the loan was to Beeland individually and not to Jadil, she loaned Beeland the money based upon the bank's long-standing relationship with Jadil and the growth potential of the company. Again, because Shannon Dye's testimony is the "crux of the State's case," we quote her testimony at great length: *Page 799 
 "[Defense counsel]: Ms. Dye, I want to go back and ask you about your conversation with Mr. Dill. First of all, you began a banking relationship with Mr. Dill in 1991; did you not?
 "[Dye]: I believe that was the date, yes, sir.
 "[Defense counsel]: And did you have occasion to follow the company as it grew?
"[Dye]: Yes, sir.
 "[Defense counsel]: When you loaned Beeland Dill money on June 15, 1993, would you tell this jury the basis of why you loaned that $175,000 to Beeland Dill?
 "[Dye]: We had been working with the company since its inception. They had been an account at the bank. And based on the information that I had as far as the growth of the company, I felt like it would be a good loan to make.
 "[Defense counsel]: You didn't loan it to Beeland because Jimmy Dill asked you to loan it to her, did you?
"[Dye]: No, sir.
 "[Defense counsel]: He never suggested that you give Beeland Dill any money when you talked to him on May 20, did he?
"[Dye]: I don't believe so, no, sir.
 "[Defense counsel]: And when you gave her the $175,000 you gave it based on the history of the company; is that right?
 "[Dye]: I loaned it to her based on the company.
 "[Defense counsel]: The fact she was going to pledge stock from the grandmother, did that really make a hill of beans to you?
"[Dye]: Not really, no, sir.
 "[Defense counsel]: So, is it your testimony that Jimmy Dill didn't ask you to give any money to Beeland Dill on that occasion?
 "[Dye]: I don't remember who actually asked about the loan itself and the amount.
". . . .
 "[Defense counsel]: And when you talked to him on the phone, tell the jury [for] what purpose you believe Jimmy Dill was calling you.
 "[Dye]: Jimmy was going into the State as insurance commissioner, and he had to divest himself of any relationship with the company that he owned or was president of.
 "[Defense counsel]: Was that basically the theme and tenor of the conversation that he was calling you to say, `look, Shannon, you and I have had a banking relationship, but I've got to totally divest myself from Jadil and get out of it, and I just wanted to let you know that'?
"[Dye]: Yes, sir.
". . . .
 "[Defense counsel]: But didn't he say that, Beeland is going to take over?
"[Dye]: Yes, sir.
 "[Defense counsel]: And didn't he tell you there was something about a stock deal, but it didn't work to help him completely-look at your notes. It is something about a trust, and there was a trust agreement, but apparently that was stopped and didn't work?
 "[Dye]: From my understanding, the mother — Jimmy's mother — owned the stock that was supposed to go to the trust. Jimmy was trustee for the children on that trust. They did not want the stock to go to the trust. The life insurance would remain, the proceeds of the life insurance would remain in the trust.
 "[Defense counsel]: Was this conversation simply a conversation that Jimmy Dill was having with you about the status of the ownership of the company?
 "[Dye]: According to my notes, we talked about all of this information in that conversation.
". . . .
 "[Defense counsel]: The fact that Jimmy Dill told you that his mother was going to give the stock to a trust and that Beeland was going to buy stock from the mother or anything of that nature, did that make any difference to you?
"[Dye]: Not really."
(R. 172-76.)
Dye further testified that although the loan payments of $3,500 per month were automatically deducted from Jadil's account, because Jadil was a Subchapter S corporation, *Page 800 
the money in that account was ultimately Beeland's money and Beeland personally paid the taxes on it. (R. 178-179.) Dye testified that she had written Dill's salary in her notes only because "the cost of his salary that was an expense to the company would be enough to pay back the loan." She testified that there has been no trouble with Beeland's repayment of the loan. (R. 168.)
Dye further testified that she may have also spoken to Dill's accountant, Gerald Rowe, with regard to how Jadil was being divested from Dill and transferred to Beeland. (R. 188.) Although the loan agreement was marked as for a "business" purpose, Dye testified that Beeland never informed her what she was going to do with the $175,000, and that she did not know what Beeland did with the money. (R. 190, 194.)
Shannon Dye did not testify that she had been coerced in any manner or that she made the loan to Beeland Dill based on Jimmy Dill's position as insurance commissioner. Dye's testimony is consistent with Dill's testimony that although he may have told Dye that Beeland would need $175,000 to buy Jadil, he did not ask Dye to make the loan to Beeland. (R. 632, 696-97.) Thus, the State's argument that Dill manipulated Shannon Dye must fail.
The State also contends that, in addition to using his position as insurance commissioner to procure a $175,000 loan to Beeland, Dill "manipulated" his attorneys Judith Todd and John Cooper, his accountant Gerald Rowe, and his daughter Beeland to divert the proceeds of this loan to himself. The State characterizes Dill's actions as "manipulative" and argues that "[t]here is every indication that Dill manipulated his attorneys, his accountant, his bank, and his daughter into obtaining the 175,000 he needed to pay his debts." (State's brief at p. 41.) However, the testimony presented at trial does not support this conclusion.
There was no evidence — only conjecture and surmise — that Dill manipulated anyone in this case or that Dill used his position as insurance commissioner to procure a $175,000 loan to Beeland, the proceeds of which he planned to surreptitiously divert to himself. The testimony presented at trial does not support the State's "manipulation" theory.
The State asserts that Dill "persuad[ed] Beeland to borrow the money under the pretense of purchasing the stock from his mother and then giving the money to him." (State's brief at p. 41.) However, Beeland Dill testified that her father never asked her to borrow the money. Dill's accountant, Gerald Rowe, testified that he told Beeland that her father needed $175,000 and that he suggested to Beeland that "she was one of the few people that might be able to help him with that." (R. 478.) Thus, the evidence supports the conclusion that the $175,000 figure came from Rowe. The State presented no evidence that Dill asked Rowe to have this conversation with Beeland or that he even knew that it had taken place. Beeland testified that Rowe informed her that her father needed $175,000, and that she never told her father that she was borrowing the money to give to him. (R. 540.)
Nor did the evidence show that Dill manipulated his attorneys so as to manipulate what facts were presented to the Ethics Commission in the request for an advisory opinion. James Anderson, a former Ethics Commission chairman, testified that Dill's attorney, John Cooper, telephoned him with questions about what, under the Ethics Act, Dill could and could not do as insurance commissioner. All of Anderson's contacts were through John Cooper by telephone. (R. 277.) Anderson called the Ethics Commission, who informed him that he needed to get the request for an advisory opinion to the Commission quickly in order for the Commission to draft the advisory opinion at their next meeting, which was on May 26, 1993. (R. 281.) Anderson, not Dill, provided the Ethics Commission with the facts upon which their advisory opinion was based. Anderson testified as follows:
 "[James Anderson]: I told them [Dill] was president — at that time I thought he owned this company or owned the majority of it — and that they had devised a plan to try to sever his relationship, based on some suggestions that I had made. You know, I don't think there was ever any *Page 801 
question that he was doing this. And we were asking for guidance from the Ethics Commission about how he could do this so it wouldn't violate any laws.
 "The other thing that was of particular interest to us, at that time I was more concerned with the fact that his daughter was going to be taking over the business. We wanted it on record that the Ethics Commission had said it is okay. She was a grown emancipated woman that was in the insurance business, and I knew that the ethics laws in that situation, that she could have an insurance interest and Jimmy could be the insurance commissioner. But we wanted it real clear that this had happened, and it was done. And we kind of put all the cards on the table and said, Beeland is going to be taking over this business, and we want to tell you about that, because if somebody comes in and questions this, we can go back and look and see that we have an advisory opinion that says that Beeland was in charge of it.
 "My concern was that Beeland be able to do this with the understanding that Jimmy had severed his ties from the company, and that this is how we elected to do that.
 "[Defense counsel]: James, you said that the Ethics Commission knew that he was president of this company and also appointed insurance commissioner. Did the Commission ever advise you or Jimmy Dill, to your knowledge, that he should resign his position as insurance commissioner?
 "[James Anderson]: No. I think it was apparent from my letter that he was going to be leaving and severing his ties with the company. So I think it kind of spoke for itself. Here he was as one day in the insurance business and the next day the governor calls him and asks him to be commissioner, and he says yes, and he immediately accepted the job, and he still was the president of this company. So I told him he couldn't stay on doing that, and we needed to get an opinion from the Ethics Commission about how to do this, especially on how to do it so his daughter could come in and they could see there were no ties between Jimmy and the company.
". . . .
 "[James Anderson]: My purpose was to advise him on how he needed to sever that relationship so that he could remain insurance commissioner, not have a relationship with the business, and have the money that he had earned or made in that company be paid to him where there were no strings attached between him and the business, and then also to take the second steps so that Beeland, his daughter, could, in fact, take over that business."
(R. 282-86.) Anderson further testified that the phrase "lump-sum" settlement was his term, and that that terminology was not provided to him by Dill or by John Cooper. (R. 287.)
In furtherance of its theory that Dill manipulated everyone involved in this case to circumvent the Ethics Act and to surreptitiously divert $175,000 to himself, the State points to the bare fact that the sale of stock to Beeland from her grandmother (the original purpose of a $175,000 loan as discussed by Todd, Cooper, and Rowe) did not occur. However, James Anderson testified that the stock sale did not go through because of severe tax consequences to Mrs. Dill.
Moreover, Dill's receipt of $175,000 as a "lump-sum settlement" was in keeping with the Ethics Commission advisory opinion upon which he relied. As James Anderson testified, even though Dill wore two hats from the minute he was appointed, Dill attempted to resolve that conflict expeditiously. (R. 329.) Dill concluded his association with Jadil within 27 days of his appointment as insurance commissioner. In fact, Dill severed his ties with certain real estate and accounts receivable partnerships because those partners were in the insurance business. He thereby incurred for himself a $40,000 federal income tax liability.[9]
Dill accepted money from Jadil for past services and money from his daughter after his lawyer informed him that the *Page 802 
Ethics Commission Advisory Opinion stated that a "lump-sum settlement" was permissible. The State's "manipulation" theory is not supported by the evidence.
The State also asserts that, because Dill had had no ownership interest in Jadil, Dill should have and could have resigned immediately from Jadil when he was appointed insurance commissioner. Dill asserts that he did not intend to violate the Ethics Act and that he was merely attempting to sever his ties with Jadil, in compliance with that law, without destroying the company he had built. Dill argues that, due to the unusual situation involving then Governor Hunt's removal from office and then Governor Folsom's need to assemble a cabinet quickly, he had very little advance warning that Governor Folsom would be appointing him insurance commissioner and, thus, had no opportunity for premeditation. We agree. This was not the usual situation where a governor-elect has time to choose and assemble a cabinet, thereby giving cabinet members ample warning that they will be appointed and sufficient opportunity to settle their affairs before they are sworn into office. There was no evidence that anyone informed Dill that he needed to sever his ties to Jadil in the short time period between his learning that he was being considered for the position and Governor Folsom's announcing his appointment at a press conference.
We find that 27 days is not an unreasonable amount of time for Dill to wind up his affairs with respect to a company he started and of which he was the president, secretary, and day-to-day manager. Moreover, the State failed to show that Dill's actions in May as part of winding down and severing his ties with Jadil were "without justification." There was no evidence of any action or inaction from which Dill illegally profited due to any delay in divesting.
In light of the unusual situation surrounding Dill's appointment, the following activities by Dill during those 27 days he was severing his ties with Jadil cannot be viewed as "evidence" of his intent to violate the Ethics Act: (1) Dill's signing of checks for Jadil as its president in May, writing himself a $10,000 bonus check and a $1,895 payroll check from Jadil on May 29, 1993, and firing Jadil employee Beverly Butler on May 28, 1993; (2) Jadil's paying $35,000 to the Internal Revenue Service on Dill's behalf as payment for Dill's income tax liability relating to his services to Jadil from January 1993 to May 31;[10] and (3) Jadil's discharging Dill's $128,000 debt to Jadil and, in exchange, Dill's transferring to Jadil his interests in certain partnerships that owned real property and accounts receivable.[11]
Because the State failed to show that Dill's actions in May in severing his ties with Jadil were "without justification," these actions cannot rightly be viewed as evidence of an intent to violate the Ethics Act. Therefore, the State is left with the following circumstances to support its argument that Dill knowingly and willfully violated § 36-25-9 when he accepted the $175,000 check from Beeland: (1) Dill claimed that he did not know that Jadil had paid $35,000 directly to the IRS on his behalf, even though that payment was reflected on his tax return; (2) Dill's resignation letter from Jadil was dated May 5, although it was prepared by Todd's legal assistant between May 18 and May 20 and was not accepted by Jadil until June 1 (R. 369-71.); and (3) Dill made a written statement in January 1995 stating that he had not received any income from any entity or individual since May 5, 1993. (R. 739.) *Page 803 
Admittedly, the foregoing may have led the jury to question Dill's credibility as a witness. If a jury decides that a witness has been willfully untruthful on a material matter, then it is entitled to disregard that witness's entire testimony. Bush v.State, 695 So.2d 70 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138
(Ala. 1997); Hunt v. State, 642 So.2d 999 (Ala.Cr.App. 1993). The foregoing evidence may have led the jury in this case to disregard Dill's testimony. However, even after striking all of Dill's testimony, we still must conclude the State failed to prove its case.
Not only did the State fail to show that Dill had willfully solicited the loan for Beeland, it also failed to show that Dill knew that it was improper to accept the $175,000 check from Beeland. The State presented no evidence as to the value that could be assigned the goodwill that Dill had built up in Jadil or the amount of money that was due Dill upon his departure from Jadil. Thus, there was no evidence that Dill was not entitled to the $175,000 in addition to other monies he received.
Beeland Dill testified that she gave the $175,000 check to her father out of love and her desire for him to be able to serve as insurance commissioner. The State characterizes the $175,000 check as money that Dill received from Jadil, a company that he regulated as commissioner. Even under this characterization, however, the State failed to show that Dill's receipt of this money was improper. The Ethics Commission advisory opinion specifically stated that a lump-sum payment was permissible:
 "As part of the severance agreement, his company will pay him a lump sum settlement of all monies due him. At that point, the Insurance Commissioner would will no longer own any interest in the insurance company. His interest will be transferred to his adult daughter who is not a dependent as defined in Section 36-25-1 (12), Code of Alabama, (1975) (The Ethics Law) . . ."
(State's Exhibit 6.)
The State failed to show that Dill did not justifiably believe the $176,000 was part of his authorized severance agreement. Under § 36-25-4, Ala. Code 1975, "[t]he written opinion of the state ethics commission provided to anyone shall protect such person to whom it is directed from liability to [the state] . . . because of any official action or actions performed as directed or advised in such opinion." See Kirkland v. State,529 So.2d 1036, 1040 (Ala.Cr.App. 1988); Holcombe v. Mobile County,26 Ala. App. 151, 155 So. 638, cert. denied, 229 Ala. 77, 155 So. 640
(1934).
Although it is evident from the Ethics Commission's advisory opinion that the Commission mistakenly believed that Dill's interest in Jadil was an ownership interest, Dill did not mislead the Commission in this matter. The State presented no evidence that Dill "manipulated" his tax attorney Cooper, who in turn conferred with attorney Anderson, who in turn communicated with the Ethics Commission. Anderson testified that he had never spoken to Dill when Anderson requested the opinion; that in rushing to meet the Commission's meeting deadline and thus rushing to expedite Dill's severance from Jadil, he "assumed, apparently, incorrectly" that Dill had an ownership interest in Jadil (R. 281, 318, 381.); that he, rather than Dill, drafted the advisory opinion request; that Dill did not appear with him before the Ethics Commission to request the advisory opinion; and that he sent copies of the advisory opinion not to Dill, but to John Cooper. (R. 285.) Moreover, it was uncontradicted that Dill never read the advisory opinion request and that he did not receive a copy of it. (R. 623, 651.) Thus, the evidence showed that Dill was not even aware of the Commission's mistaken impression that he owned Jadil.
In addition, the Ethics Commission's misunderstanding as to the nature of Dill's association with Jadil does not alter the effect of the Advisory Opinion. Although the Ethics Commission's interpretation of the statute in question is persuasive authority, it is not binding on this Court. Kirkland v. State, 529 So.2d at 1040. The advisory opinion issued to James Anderson on behalf of Jimmy Dill stated that a "lump sum settlement of all monies due" Dill was acceptable as a severance payment. We agree. We also believe, however, that this statement is *Page 804 
true whether one is an owner divesting himself or herself of an ownership interest in a company or whether one is an employee terminating service to a company. In other words, whether Dill was divesting himself of ownership in Jadil or was departing as Jadil's president, a lump-sum payment for that ownership interest or as severance pay is permissible. Dill started Jadil, built its reputation and goodwill, and established the contacts on which the company was built. The State presented no evidence that Dill was not entitled to some remuneration for past services to Jadil.
As the State conceded at trial, a public official is permitted to receive payment for compensation earned before becoming a public official, even if the official position and the position for which compensation is being made are in conflict. (R. 307.) The State presented no evidence that, as Jadil's president, Dill was not entitled to severance pay upon his departure from the company as payment for the goodwill he had built. The single lump-sum payment of $175,000 left no strings attached between Dill and Jadil, and thus freed Dill to serve as insurance commissioner.
In light of the lack of evidence showing that Dill possessed the criminal intent necessary to violate the Ethics Act, this Court must ask "whether a jury might reasonably conclude that the evidence excludes every reasonable hypothesis except that of guilt." Ashurst v. State, 462 So.2d 999, 1003 (Ala.Cr.App. 1984). We find that it could not.
We further find that Dill's acceptance of the $175,000 check is shielded by his reliance on the Ethics Committee's advisory opinion, which stated that a lump-sum payment was permissible. We refuse to hold Dill strictly liable. See § 36-25-2 (d), Ala. Code 1975.
The Ethics Act should not be rigidly applied when a literal reading would frustrate the legislative "spirit and intention" behind that act. Kirkland v. State, 529 So.2d 1036 (Ala.Cr.App. 1988). In Kirkland, this Court stated:
 ". . . Chapter 25 [The Ethics Act] was enacted to prevent and place restrictions upon conflicts of interest between the private interests of a public official or employee and his duties as such. Furthermore, § 36-25-2 provides that this statute should not deny public officials and employees the opportunity to acquire and retain private economic and other interests unless there is a conflict between these private interests and the public duties of the employee or official. The purpose of this statute is clearly set out in § 36-25-2 (d). The purpose of Chapter 25 is to prescribe `essential restrictions against conflicts of interest in state government without creating unnecessary barriers to the public service.'
Ala. Code, § 36-25-2 (d) (1975)."
Kirkland v. State, 529 So.2d 1036, 1039 (Ala.Cr.App. 1988) (emphasis original). "The legislative intent behind the Ethics Act was to strike a balance between the policy of eliminating conflicts of interest and the policy of recruiting and retaining those persons best qualified to serve in government." Lambert v.Wilcox County Comm'n, 623 So.2d 727, 728 (Ala. 1993) (holding that the definition of direct personal interest should be interpreted narrowly enough so as not to "unnecessarily or unreasonably . . . impede the recruitment and retention by the government of those men and women who are best qualified to serve it").
The facts presented by this case are not among those reasonably foreseeable by the legislators drafting the Ethics Act. "We are deeply mindful of the principle that criminal statutes are to be strictly construed, but adherence to strict construction does not require an unreasonable interpretation, an interpretation that the Legislature could not have intended." Horsley v. State,374 So.2d 375 (Ala. 1979), vacated on other grounds, 448 U.S. 903,100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980). Criminal statutes "shall be construed according to the fair import of their terms to promote justice and to effect the objects of the law. . . ." § 13A-1-6, Ala. Code 1975.
In light of the unusual circumstances under which Dill was appointed as insurance commissioner, the State failed to show that Dill knowingly and willfully violated the Ethics Act. We find that the preponderance of the evidence against the verdict below is so decided as to convince this Court that the *Page 805 
verdict was wrong and unjust. "[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude." Cumbo v. State, 368 So.2d 871, 874
(Ala.Cr.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979). We find that the jury could not have reasonably so concluded.
There was no breach of the public trust. The State presented no evidence that, while serving as insurance commissioner, Dill secured any favors for his daughter or for Jadil. To hold Dill, who had no forewarning that he would be appointed insurance commissioner and who reasonably relied on an advisory opinion that permitted a lump-sum payment as a permissible part of his severance agreement, to a strict and literal reading of §36-25-9 would thwart the essential purpose behind the Ethics Act and create "unnecessary barriers to public service." §36-25-2 (d), Ala. Code 1975. The State failed to prove that Dill possessed the requisite criminal intent. Therefore, Dill's conviction for accepting the $175,000 check from his daughter while he served as insurance commissioner is due to be reversed and a judgment rendered in his favor on that count.
 III.
Dill contends that the State failed to present sufficientevidence to support his convictions of two counts of first-degree perjury. We agree.
Section 13A-10 101, Ala. Code 1975, provides that "[a] person commits the crime of perjury in the first degree when in any official proceeding he swears falsely and his false statement is material to the proceeding in which it is made." Dill was convicted of perjury based on his statements to the Ethics Commission (1) that he had no prior knowledge that he would receive $175,000 from his daughter and (2) that he "had no party to the deal." (C. 454, 465.)
To sustain a conviction of first-degree perjury, the State must prove the falsity of the defendant's testimony by more than one witness and strong corroboration from surrounding circumstances.Murry v. State, 367 So.2d 985 (Ala.Cr.App. 1978). A witness to the corpus delecti of perjury is one "who has independent knowledge of the facts to which the defendant has sworn and who testifies, based on that independent knowledge, that the defendant has perjured himself." Murry, supra, citing, Oglesby v.State, 337 So.2d 381 (Ala. 1976). The corroborative evidence needed to establish perjury is "proof of material and independent facts and circumstances, which, taken and considered together, tend in confirmation of the testimony of the single witness to establish the falsity of the oath." Watson v. State,398 So.2d 320 (Ala.Cr.App. 1980), citing, C.J.S. perjury § 70(c)(1)(1951).
Dill testified before the Ethics Commission that "as it worked out, my daughter made a gift to me. I had no party to the note. I had no party to the deal." (C. 467.) It is clear both from the phrase itself and from the testimony of the witnesses at trial that the meaning of the phrase "had no party to the deal" calls for speculation. Dean Buttram, a senior member of the Ethics Commission, testified that when Dill testified before the Ethics Commission on April 17, 1996, that he "had no party to the deal, " Dill was referring to securing from a bank the loan in the amount of $175,000 that was eventually given to Mr. Dill. Buttram testified as follows:
 "[The State]: And the deal and the note, what was [Dill] referring to?
 "[Defense counsel]: Object. How would he know what Mr. Dill was referring to? He can't read somebody's mind, Your Honor.
 "THE COURT: Overruled. You can only testify to what he told you.
 "[Buttram]: As I recollect, there was a loan at a bank, a loan secured at a bank. Funds which were a result of that loan were paid at some point to Mr. Dill.
 "[The State]: And that's what you are referring to? That's what the referral was to?
 "[Buttram]: That's not what I'm referring to. If your question is what that testimony refers to, that's what I assume it refers to. *Page 806 
"[The State]: Right. And we are still talking about the hundred seventy-five thousand dollars?
"[Buttram]: Yes."
(R. 249-50.) James Anderson, who represented Dill at the Ethics Commission hearing, testified that he assumed "the deal" referred to Dill's getting the money from his daughter. (R. 300.) Dill himself testified that when he made the statement "I had no party to the deal," he was referring to the transaction that "had to do with Beeland borrowing the money or me being involved in asking anybody to loan her any money or my being a party to any of that." (R. 647.) As previously discussed, the State failed to show that Dill manipulated anyone in order to secure a loan to Beeland or that Dill asked Dye to give Beeland a loan.
Dill did not dispute Shannon Dye's testimony that he had mentioned to her that Beeland might need a $175,000 loan to take over as president of Jadil. (R. 632.) While the testimony presented at trial showed that Dill initiated the discussion with Dye in which a loan to Beeland was first discussed, Dye testified that Dill never asked her to make a loan to Beeland and that, following the phone calls from Gerald Rowe and Beeland, Dye made the loan to Beeland based on the growth potential of Jadil. The State presented no evidence to the contrary. Shannon Dye was not a "witness to the corpus delecti of perjury." Murry, supra.
To establish perjury, the corroborative evidence must be strong. Watson, 398 So.2d at 325. In light of the nebulous nature of the phrase "had no party to the deal," we cannot say that Dill's cursory telephone call to Shannon Dye, in which he mentioned that Beeland might need a loan, is sufficient to establish that Dill swore falsely before the Ethics Commission when he stated that he "had no party to the deal." Therefore, we find that the State failed to present sufficient evidence from which the jury could reasonably conclude that Dill "had a party to the deal" or that Dill committed perjury before the Ethics Commission when he stated otherwise.
The evidence is also insufficient to support Dill's perjury conviction based on his statement that he had no prior knowledge that he was to receive the $175,000 from Beeland. Dill admitted to the Ethics Commission that he had spoken to his attorneys about permissible ways he could receive money from Jadil on his departure from the company:
 "[Dill]: I didn't know that money was coming, and I didn't know what form the money might come in if it ever came.
 "[Ethics Commission]: How do you know that [the money] might come if you did not know what form it would come in?
 "[Dill] Because I was privy to the fact . . . that there was a conversation between Gerry Rowe, John Cooper at Sirote [Permutt], my mother and whoever else was present, how do we get rid of the company, how do we move the company to Beeland, whatever it is that they were going to do."
(C. 466.)
To show that Dill did in fact have prior knowledge that he was to receive the $175,000, the State presented evidence that, it argues, proves that Dill wrote a check for $20,000 before he received the $175,000 check, at a time when he had only $7,000 in his bank account. The State asserts that if Beeland wrote the check on June 18, then Dill must have had prior knowledge that he was going to receive the $175,000 when he wrote a check for $20,000 on June 17.
However, Beeland Dill testified that although she wrote the $175,000 check on June 15 and put it the mail to her father, she had changed the date on the check to "June 18" by changing the five to an eight, in order to ensure that there would be adequate funds in her account when the check cleared. Dill testified that he received the $175,000 check on June 16 or 17 and then wrote a check for $20,000 to pay off a debt. He testified that he took the $175,000 check to Birmingham on June 18 and deposited it.
Thus, the State's primary evidence that Dill knew ahead of time that he was going to receive $175,000 from Beeland is the "June 18" date on the $175,000 check. However, Beeland testified that although she wrote the $175,000 check on June 15, she changed the date on the check from June 15 to June 18 to give it time to clear her account. (R. 550, 591.) State's Exhibit 11A clearly shows that *Page 807 
the "5" was indeed changed into an "8" on the date line of the check. The State presented no evidence that anyone other than Beeland altered the date on the check. Furthermore, the sequence and timing of Beeland's checks in her check register support her testimony that she wrote the check for $175,000 on June 15 and not on June 18. (R. 218-22; C. 365, 368.)
No witness in this case testified that Dill had prior knowledge that he would receive the $175,000 check from Beeland. Beeland testified that she did not tell her father that she was going to send him the check and said that she did not even speak to him about it afterwards. (R. 543, 549.) Gerald Rowe testified that he did not tell Dill that he had spoken to Beeland about sending Dill $175,000. (R. 482.) Rowe testified that although he spoke to Beeland about giving money to her father, he did not know that Beeland had gotten the loan. (R. 480.) James Cooper testified that he did not know that Beeland was going to give her father $175,000 before she did it. (R. 453.)
Dill also testified that no one told him that Beeland was sending him this check and that he did not know it was coming. Dill testified that his accountant and lawyers were trying to get him some money upon his departure from Jadil, but that he did not know that Beeland was sending him a check. James Anderson also testified that although Dill said that he knew there had been some efforts by his attorneys and accountant to get him some payment from Jadil when its interest transferred over to Beeland, Dill told him that he did not know Beeland was sending him the $175,000 check. In fact, Anderson testified as follows in regard to what occurred when he conferred with Dill outside of the Ethics Commission hearing:
 "I asked him, I said, `Jimmy, the way the questions went, you had an opportunity to explain this, even though his accountant and his tax lawyer had said this is a gift for tax purposes, why didn't you just say this was a payment for that amount?' He said `I didn't know how much it was exactly going to be. I didn't know if it was going to get worked out.' He said, `Honestly, I couldn't tell them under oath that I knew I was going to get $175,000 from my daughter.'"
(R. 301-02.)
The evidence is simply insufficient to show that Dill had prior knowledge that Beeland was sending him a check for $175,000. The evidence did not establish that the loan was finalized during Dill's conversation with Shannon Dye, that anyone told Dill that the loan had been approved, or that Dill otherwise knew that the loan had been approved and that he was going to receive its proceeds.
Thus, the State had no `witness' to the corpus delecti of perjury" with respect to Dill's statement that he had no prior knowledge that the money was coming to him. See Watson v. State,398 So.2d 320 (Ala.Cr.App. 1980). Viewing the evidence in the light most favorable to the State, we find that the evidence is insufficient to support a perjury conviction based upon Dill's statement that he no prior knowledge that he was going to receive $175,000 from his daughter.
Based on the foregoing, Dill's convictions for perjury in the first degree as set out in Counts III and IV of the indictment are due to be reversed and a judgment rendered in his favor.
 IV.
Dill contends that the indictment, which sets out two separate first-degree perjury counts, is duplicitous. As discussed above, Count III of the indictment charges that Dill committed perjury when he made the statement that he "had no prior knowledge that he was to receive a check or money which he received from his daughter." Count IV charges that Dill committed perjury when he made the statement that he "had no party to the deal."
Dill argues that these multiple counts prejudiced him by suggesting to the jury that he had committed two crimes instead of one. He claims that either the State should have been required to elect between these two counts or the trial court should have granted his request for a limiting instruction explaining that the existence of two counts does not indicate any further guilt on the part of the defendant. *Page 808 
"Duplicity" is the joining of two or more separate offenses in a single count. Capps v. State, 587 So.2d 442, 444 (Ala.Cr.App. 1991). "Multiplicity is the charging of a single offense in more than one count." King v. State, 674 So.2d 1381, 1383
(Ala.Cr.App. 1995). Although Dill argued to the trial court that his indictment was "duplicitous," when he meant "multiplicitous," the trial court was made sufficiently aware of the grounds of Dill's objection.[12] (R. 261, 267-73.)
An indictment is multiplicitous if a single offense is charged in more than one count, thereby possibly prejudicing the defendant by suggesting that more than one offense had been committed. Here, Dill was convicted for two separate counts of perjury based on two statements — that he had no prior knowledge that he was to receive the $175,000 check from Beeland and that he was not a "party to the deal" — made within the same proceeding before the Alabama Ethics Commission.
This is not an instance where the same act or transaction constitutes a violation of two distinct statutory provisions. SeeBlockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180,182, 76 L.Ed. 306 (1932). Rather, it is a case where each successive act or statement has been charged as a separate crime under the same statute. The pertinent inquiry then becomes defining the correct unit of prosecution. Bell v. United States,349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955)
We have found no Alabama cases that address the issue of multiplicity in the context presented by this case. In Oglesby v.State, 337 So.2d 381 (Ala. 1976), however, the Alabama Supreme Court addressed the issue whether a perjury conviction could stand on evidence consisting solely of two inconsistent statements by the defendant. While the Court held that it could, it also found that the trial court's failure to require the state to make an election between the two perjury counts in the indictment was error. In that case, the two perjury counts "involved separate transactions." In the present case, Dill's two statements relate to the same transaction — his receipt of $175,000.
In Commonwealth v. Gurney, the Court of Appeals of Massachusetts addressed the multiplicity issue presented when the substance of an alleged perjury charged in one count is included within the substance of another count. 13 Mass. App. Ct. 391,433 N.E.2d 471 (Mass.App. 1982). That court's review of both Federal and state caselaw revealed that "convictions for perjury will only be held reversible on the ground of multiplicity where individual falsehoods are so related . . . [in] subject-matter . . . [and] so linked and blended together in point of time, as to constitute but one act or transaction, and therefore constitute one offense." Id. That court further found that "[m]ultiple convictions will be allowed to stand even where the factual difference between the perjuries is slight." Gurney, 433 N.E.2d at 475.
In some federal circuits, two counts of perjury are separate offenses and are not multiplicitous if: (1) they allege different lies; and (2) the second false statement further impaired the operations of the body before which the statement was made.United States v. Salas-Camacho, 859 F.2d 788, 791 (9th Cir. 1988); United States v. Hubbard, 474 F. Supp. 90, 98 (D.D.C. 1979), aff'd. on other grounds, 668 F.2d 1238 (D.C. Cir. 1981),cert. denied, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440
(1982).
Section 13A-10 101, Ala. Code 1975, proscribes making a material false statement in an official proceeding:
 "A person commits the crime of perjury in the first degree when in any official proceeding he swears falsely and his false statement is material to the proceeding in which it is made."
Each false statement by a defendant may be charged in separate counts even though the defendant made each statement during the same testimony or hearing. Each false *Page 809 
statement under oath concerning a different material fact constitutes a separate and distinct violation, and thus may be charged in separate counts even though made during the same testimony. 70 C.J.S. Perjury, p. 285. "[A]n indictment charging separate counts for each violation of the same criminal statute is not multiplicitous." King v. State, 674 So.2d 1381, 1383
(Ala.Cr.App. 1995).
In the present case, however, both counts relate to Dill's receipt of the $175,000 check. The State did not present different evidence to demonstrate the falsity of Dill's two statements. In its attempt to show both that Dill was "a party to the deal" and that Dill knew that the check was coming to him, the State presented the same evidence-Dill's conversation with Shannon Dye. Because Dill's two statements concern the same material matter and because the falsity of those statements could not be proven by separate and distinct evidence, they were not properly the subjects of two separate counts in the indictment.[13]
Therefore, we find that the State should have been required to elect between Counts III and IV of the indictment. In Oglesby v.State, 337 So.2d 381, 384-85 (Ala. 1976), the Alabama Supreme Court concluded that the trial court had erred in not requiring the State to elect between the two perjury counts in the indictment and held, based upon this prejudicial error, that the appellant was entitled to a new trial. In accordance with the observations in Oglesby v. State, Dill would be entitled to a new trial. See also 2 W. LaFave J. Israel, Criminal Procedure, § 19.2 (e) (1984) (observing that "courts have noted that multiple counts may also work against defendant by leading the jury to believe that defendant's conduct is especially serious because it constitutes more than one crime"). However, as discussed in Part III of this opinion, Dill's convictions under Counts III and IV are due to be reversed and a judgment rendered in his favor based on insufficiency of the evidence. Therefore, this issue is actually moot.
 V.
Dill contends that the Alabama Ethics Act is unconstitutionally vague. Specifically, Dill argues that to convict him "because, although he sought to divest himself in good faith, he failed to reasonably interpret an ethics opinion that gave little, if any, specific direction on how to divest, would amount to applying criminal sanctions for a strict liability offense and violate his right to due process of law." (Appellant's brief at p. 37.)
Dill argues that in this case, the advisory opinion issued by the Ethics Commission itself was vague, thus compounding the vagueness of the Ethics Act. He contends that the advisory opinion was vague because it did not specify a time frame within which he needed to sever all ties with Jadil. He further argues that the opinion did not put him on notice as to what constituted an improper "association."
In short, Dill argues that the advisory opinion, coupled with the Ethics Act, did not provide him sufficient warning of what conduct was proscribed. See McCrary v. State, 429 So.2d 1121
(Ala.Cr.App. 1982) (a statute that does not provide sufficient warning of what conduct is proscribed is unconstitutionally vague.)
 "`[B]ecause" [t]he essential purpose of the void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct, Jordan v. De George, 341 U.S. 223, 230, 71 S.Ct. 703, 707, 95 L.Ed.2d[L.Ed.] 886 (1951), "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," Parker v. Levy, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439
(1974), "even though the statute may well be vague as applied to others," Aiello v. City of Wilmingham [Wilmington], 623 F.2d 845, 850 (3d Cir. 1980). Therefore, a defendant who challenges the statute on the grounds of vagueness "must demonstrate that the *Page 810 
statute under attack is vague as applied to his own conduct, regardless of the potentially vague applications to others." Aiello, 623 F.2d at 850."
Ex parte Woodard, 631 So.2d 1065, 1069 (Ala.Cr.App. 1993) (emphasis original), quoting Senf v. State, 622 So.2d 435, 437
(Ala.Cr.App. 1993).
The constitutionality of the Ethics Act, however, has repeatedly been upheld. See Comer v. City of Mobile,337 So.2d 742, 750 (Ala. 1976); Langham v. State, 662 So.2d 1201, 1206-07
(Ala.Cr.App. 1994). We find no merit to Dill's argument.
 Conclusion,
This case arose out of quite unusual and historic circumstances. The difficulty presented by this case, however, has not been due to the involved facts, but rather the lack of caselaw that could be used for guidance. Nevertheless, after thoroughly examining the record, we are convinced that justice and a clear reading of the applicable statutes require the following result. Consequently, in light of the State's failure to prove that, within the statutory limitations period, Dill was "associated" with a business he regulated as insurance commissioner, Dill's conviction under Count I of the indictment is due to be reversed and a judgment rendered in his favor on that count. In light of the State's failure to prove that Dill possessed the requisite criminal intent when he accepted the $175,000 check from his daughter, Dill's conviction under Count II of the indictment is due to be reversed and a judgment rendered in his favor on that count. Dill's perjury conviction under Count III, which was based on Dill's statement to the Ethics Commission that he had no prior knowledge that he was to receive money from his daughter, and Dill's perjury conviction under Count IV, which was based on Dill's statement that he "had no party to the deal," are due to be reversed and a judgment rendered in his favor.
REVERSED AND JUDGMENT RENDERED.
[1] Governor Hunt's conviction was affirmed by this Court on December 13, 1993, and his application for rehearing denied on January 12, 1994. Hunt v. State, 642 So.2d 999 (Ala.Cr.App. 1993) The Alabama Supreme Court granted certiorari review and affirmed Hunt's conviction. Ex parte Hunt, 642 So.2d 1060 (Ala. 1994).
[2] Although Jimmy Dill "was" Jadil, in the sense that he started Jadil and served as its president, secretary, and day-to-day manager, his mother, Catherine Dill, owned all of Jadil's stock.
[3] Dye testified that although Dill told her that Beeland might need a loan, he did not ask her to give Beeland a loan, and she did not give Beeland Dill the money based on Dill's position as Insurance Commissioner:
 [Defense counsel]: When you loaned Beeland Dill money on June 15, 1993, would you tell this jury the basis of why you loaned that $175,000 to Beeland Dill?
 "[Dye]: We had been working with the company since its inception. They had been an account at the bank. And based on the information that I had as far as the growth of the company, I felt like it would be a good loan to make.
 "[Defense counsel]: You didn't loan it to Beeland because Jimmy Dill asked you to loan it to her, did you?
"[Dye]: No, sir.
 "[Defense counsel]: He never suggested that you give Beeland Dill any money when you talked to him on May 20, did he?
"[Dye]: I don't believe so, no, sir.
 "[Defense counsel]: And when you gave her the $175,000 you gave it based on the history of the company; is that right?
"[Dye]: I loaned it to her based on the company."
(R. 172-76.)
[4] The State characterizes this check as money that Dill received from Jadil, a company he regulated as insurance commissioner.
[5] Ostensibly, Dill was stating that he was not a party to, or that he had no part in, Beeland's $175,000 loan from First Alabama Bank or Beeland's sending this money to Dill.
[6] We note that the applicable statute of limitations for violations of the Ethics Act occurring after October 1, 1995, is four years. See § 36-25-27 (g), Ala. Code 1975.
[7] This would not be the case under the definition currently found in § 36-25-1. Effective October 1, 1997, § 36-25-1
defines a "family member of the public official" as "[t]he spouse, a dependent, an adult child and his or her spouse, a parent, a spouse's parents, a sibling and his or her spouse of the public official."
[8] Section 36-25-12, Ala. Code 1975, was amended effective October 1, 1995.
[9] Jadil did discharge a 128,000 debt Dill owed to Jadil in exchange for these partnership interests.
[10] As we noted earlier, Gerald Rowe testified that Jadil paid this money directly to the IRS on Dill's behalf on July 2, 1993, and that this amount represented payment of Dill's income tax liability relating to Dill's services to Jadil from January 1993 to May 31, 1993, or before. (R. 509.) The State failed to present any evidence that the $35,000 was payment for anything other than services rendered before June 14, 1993.
[11] The State failed to present any evidence that the property interests Dill transferred to Jadil were of lesser value than the amount of Dill's discharged debt to Jadil. This transfer of property interests was also part of Dill's efforts to comply with the ethics laws in that the transfer severed Dill's ties with partners who were also in the insurance business. (R. 425, 517.) Whether the $128,000 debt was discharged as compensation for past services as part of Dill's severance from Jadil or was transferred in exchange for discharge of the debt, the transaction complied with the advisory opinion.
[12] Dill argued before the trial court in his motion for a judgment of acquittal that the State should be required to elect between Counts III and IV because the two counts were identical. The trial court, while noting that it was "struggling" with this issue, decided to allow both counts to go to the jury. (R. 272.)
[13] We note that during its hearing, the Ethics Commission did not rephrase its questions to Dill in an attempt to compound the number of perjury charges against him. In fact, when Dill made the statement that he "had no party to the deal," Dill was not responding to a question, but, rather, was making a statement on his own. However, this does not alter the fact that the State should have been required to elect between the two perjury counts in the indictment.
LONG, P.J., and COBB and BASCHAB, JJ., concur.
McMILLAN and BROWN, JJ., recuse.