[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 628 
The appellant, Keith Parks, was convicted of four counts of capital murder: (1) intentionally causing the death of Randall Gilliland and James Davis by one act or pursuant to one scheme or course of conduct, in violation of § 13A-5-40(a)(10), Ala. Code 1975; (2) intentionally causing the death of James Davis by shooting him with a firearm and intentionally causing the death of Randall Gilliland, by shooting him with a firearm, by one act or pursuant to one scheme or course of conduct in violation of § 13A-5-40(a)(10), Ala. Code 1975; (3) intentionally causing the death of Randall Gilliland during the course of a first-degree robbery in violation of § 13A-5-40(a)(2), Ala. Code 1975; and (4) intentionally causing the death of James Davis during the course of a first-degree robbery in violation of § 13A-5-40(a)(2), Ala. Code 1975. Parks was sentenced to life imprisonment without the possibility of parole.
The evidence established that around 11:00 a.m. on October 15, 2003, Gilliland picked up his friend Davis, who was confined to a wheelchair, at the house of Davis's mother. Gilliland then proceeded to pick up Parks at Parks's house. Gilliland was a tile contractor, but his hobby was raising fighting roosters. The purpose of picking up Davis and Parks was to obtain their assistance in cutting the combs of the fighting roosters, an established practice in that field. After the three men left Parks's house, they drove to a McDonald's fast-food restaurant in Calera in Shelby County to meet Gilliland's brother-in-law and pick up a check in the amount of $50 Gilliland had requested from his sister.
The men arrived at McDonald's early, so they remained in the car and drank six 16-ounce beers while they waited for Gilliland's brother-in-law. After finishing the beers, Gilliland purchased another six-pack from a store across the street from McDonald's. When they returned to McDonald's, Gilliland's brother-in-law had arrived, and he tendered the check to Gilliland. Gilliland, Davis, and Parks then drove to a bank and cashed the check.
On the way back to Gilliland's house, the men stopped in Wilton and bought an additional case and a half of beer. At trial, Parks testified that he gave Gilliland $20 to pay for his share of the beer. Parks also testified that when Gilliland handed him the beer through the car window, Gilliland handed Parks a "wad" of money including some change. When the three men arrived at Gilliland's house, they continued to drink beer and then began grooming the roosters. After cutting the combs on three or four of the roosters, they drank more beer and then began *Page 629 
drinking moonshine. A total of 10 roosters had been groomed before the men went inside around dusk.
At trial, Randall Lucas testified that he was clearing brush on his property, which is adjacent to Gilliland's, in the late afternoon of October 15, 2003, when he heard several gunshots, a brief pause, and then several more gunshots. Lucas stated that he heard four to five gunshots in all. After completing his work clearing brush approximately 20-30 minutes later, Lucas left the property to go home. As he was leaving, Lucas saw a police patrol unit on the bridge over Six Mile Creek.
Kenneth Harbison testified that he was driving his truck through the community of Six Mile on the evening of October 15, 2003. As he passed the man later identified as Parks walking alongside the road, Parks appeared to swing something toward the truck. Harbison turned his truck around and discovered Parks standing in the middle of Six Mile Bridge. Harbison testified that he recognized his grandparents approaching the bridge in oncoming traffic and that they had to swerve to avoid hitting Parks. When Harbison stopped to check on his grandparents, Parks attempted to get inside Harbison's truck. Harbison approached the truck and Parks pointed the shotgun at Harbison's abdomen and, according to Harbison, threatened him.
Harbison wrested the shotgun away from Parks and placed it on the hood of his truck. Harbison and Parks began to scuffle. Eventually, Harbison was able to overpower Parks, and he pinned him down to the ground until police arrived.
A 911 emergency call was received by the Bibb County Sheriffs Department regarding the incident. When deputies arrived, a Centreville police officer was already on the scene. One of the deputies on the scene removed the shotgun from the hood of the truck and placed it in the trunk of his patrol car for safety. Before doing so, he determined that the shotgun was not loaded. The butt of the shotgun had been wrapped with camouflage tape.
Deputies arrested Parks and charged him with reckless endangerment and public intoxication. Harbison also signed a warrant against Parks for assault. When questioned, Parks told sheriff's deputies that he had been at a friend's house. Parks was unsteady on his feet and deputies had to assist him into the car. He appeared intoxicated and the odor of alcohol emanated from around his person, although he responded appropriately to questioning.
On October 17, 2003, John Kish, a close friend of Gilliland's, went to Gilliland's house because he had not heard from his friend in four days. When Kish entered the house, he found Gilliland lying face-down on the living room floor, with a handgun beside him. Kish realized immediately that Gilliland was dead, and he telephoned 911 for emergency assistance. Kish next telephoned a mutual friend, Nina Hallman, but she did not answer. Kish then telephoned his mother and reported to her that Gilliland was dead.
Kish had noticed Davis's wheelchair outside when he entered the house, so he believed that Davis was at the house also. Kish walked down the hall and began to look for Davis. Kish discovered Davis's body in the bathroom, [1] hanging over the edge of the toilet, with his head between the toilet and the bathtub. Davis's torso was turning purple, which indicated to Kish that Davis was also dead. Kish left *Page 630 
the house. Kish walked over to his van, which Gilliland borrowed to use as a work vehicle, opened the van door, and sat on a bucket while he waited for police to arrive.
Bibb County sheriff deputies arrived approximately 20-30 minutes later. A deputy spoke to Kish before entering the house. Once inside, the deputy found Gilliland lying in the living room and Davis slumped over the toilet in the bathroom. Coroner Downey McGee was summoned and pronounced Gilliland dead at 9:55 a.m. and pronounced Davis dead at 9:56 a.m.
Law-enforcement officers from the sheriff's office and the Alabama Bureau of Investigation secured the area and began processing the crime scene. They found Gilliland's body lying facedown on the living room floor with a handgun nearby. A yellow-handled knife and a dark-handled folding knife were found next to the gun. A gun holster was found under the coffee table beside Gilliland's arm. A ring of keys and an empty wallet were also lying on the floor near Gilliland's body. Papers and various receipts surrounded the empty wallet. A large bloodstain was discovered on a nearby chair. Blood was also found on a purple pillow. Another handgun was found in the kitchen on the top of the refrigerator. All the physical evidence was collected and sent to the Alabama Department of Forensic Sciences for testing.
Davis's body was found leaning over the toilet in the bathroom. A third handgun was found on a bedside table in the master bedroom. Investigators observed a gun cabinet in the same bedroom; the glass had been broken out of the door. A roll of camouflage tape was found between the gun cabinet and bed similar to camouflage tape wrapped around the shotgun that was in Parks's possession at the time of his arrest on Six Mile Bridge. A second set of keys was found on the ground beside a car parked in Gilliland's yard. A piece of a broken key was extracted from the ignition of the car. This evidence was also sent to the Alabama Department of Forensic Sciences for analysis.
Autopsy results indicated that Gilliland suffered two gunshot wounds to the head; one entered his right cheek and the other entered his forehead. Both bullet fragments were recovered during the autopsy. It was determined that Gilliland had also suffered two sharp-force injuries. Gilliland received a stab wound to his upper left forearm and a cut to his lower left forearm. The medical examiner testified that the gunshot wounds suffered by Gilliland were equally fatal. He estimated that Gilliland expired within one minute of suffering the gunshot wounds. The autopsy results indicated that Gilliland had been dead 36-48 hours when his body was discovered.
Autopsy results indicated that Davis died from a gunshot wound to his head. One bullet passed through his lip; the wound was not life-threatening. Another bullet entered his chin and traveled to his neck. A third fatal bullet entered the posterior skull, causing multiple injuries to the brain. A fourth bullet entered and exited Davis's left palm. The medical examiner testified that the injuries to Davis's hand and lip could have been caused by the same bullet if Davis had held his hand defensively in front of his face in anticipation of the gunshot. Two bullet fragments — one from Davis's neck and one from his head — were recovered during the autopsy. The medical examiner determined that Davis had been dead for 24-36 hours when his body was discovered. On cross-examination, the medical examiner testified that time-of-death calculations were approximate and could be impacted by external factors such as temperature, a *Page 631 
decedent's activities prior to death, and body mass.
One of the sheriff's deputies who responded to Gilliland's house on October 17, 2003, also responded to the call that resulted in Parks's arrest. He suggested to the homicide investigators that they should consider questioning Parks about his activities before he was arrested on the bridge. On October 17, 2003, after signing a waiver of his Miranda[2]
rights, Parks gave a statement concerning his activities on October 15, 2003. Parks stated that on that day, he had been with Gilliland and Davis at Gilliland's residence drinking and trimming the combs of roosters for cockfighting. At one point, they left and went to Montevallo, to meet his brother-in-law. He stated that he left Gilliland's residence that night after dark. When he left the residence, Gilliland, Davis, and another man he identified as James were at the residence. According to statements made by Parks to law-enforcement officers on October 17 and November 3, 2003, a fourth man named James drove up to Gilliland's house in a Chevrolet truck painted in primer gray. Parks told officers that he did not know the man but that he was aware that the man participated in cock-fighting with Gilliland. Parks stated that "James" drank a few beers with them that day but then began to argue with Gilliland about money owed him from a previous cockfight. Parks stated that he tried to calm the men down, but that the argument continued for almost 20 minutes. Parks claimed that he walked outside to get away from the argument and saw a shotgun leaning against the porch. Afraid to leave the shotgun at the house while Gilliland and "James" were still fighting, Parks says he left the house with the shotgun and started walking towards Six Mile Bridge. Parks gave a description of "James," and authorities later made efforts to find the individual as part of their investigation; however, all of their leads were unsuccessful. Parks stated that no one was arguing or fighting when he left the residence. He had $20 in his pocket when he left the residence. There was some chicken blood on his clothes from trimming the roosters. Parks gave investigators the clothing he had on at Gilliland's and $39 in cash. Parks voluntarily offered his knives for testing as well, which were described as a yellow-handled knife and a Gerber brand knife with a hole in the handle.[3] Parks claimed that he only had $20 when Gilliland picked him up that day. When he was arrested later that night, deputies found $39 in bills and coins in Parks's possession.
On November 3, 2003, Park signed a second Miranda
waiver of his rights and made a second statement to investigators. The second statement was similar to the first one he had given and similar to his testimony at trial. Parks made the second statement voluntarily.
Alabama Department of Forensic Sciences fingerprint analyst Shannon Fitzgerald performed fingerprint analysis of the evidence collected from Gilliland's house. Only three latent prints of value were recovered from the evidence. Those prints were compared to prints taken from Parks, but none of the prints matched Parks's. She testified that she was not surprised that she did not find Parks's prints on the items because latent finger-prints are composed of approximately 98% moisture and are very fragile. Exposure to light, moisture, and evaporation can destroy *Page 632 
latent prints, particularly if the prints have been exposed over a period of days. Fitzgerald also testified that latent fingerprints are more easily transferred onto smooth surfaces, as opposed to the rough surfaces on the guns she examined.
Tammy Fulgham Ricketts, a ballistics analyst with the Department of Forensic Sciences, testified that she performed forensic testing on the bullet fragments recovered from the autopsies and on the guns found at the scene. The results indicated that the bullet fragments recovered during Gilliland's autopsy were fired from a similar gun to the one found beside him at the scene. The shell casings collected at the scene were identified as having been fired from that gun. Forensic testing on the second gun retrieved from the scene showed that it was a different caliber than the one found beside Gilliland's body and that it had not been fired.
DNA analysis was performed on items collected at the crime scene. The right shoe Parks was wearing the night he was arrested had a large stain that was determined to be Gilliland's blood. DNA expert witness Deborah K. Dodd testified that it was her opinion that the stain on Parks's shoe was made by either stepping into a large puddle of blood or by a large amount of blood dripping onto the shoe from a free-flowing wound.
Inmate Johnny Hallman testified that while he and Parks were incarcerated together at the Bibb County jail, Parks confessed to murdering Gilliland and Davis. After one to two months in lockup, Parks told Hallman that he "killed Randy Gilliland and the guy that was with him." Hallman admitted that he had planned to retract his statement because he discovered that Parks found out about it and their cells were adjacent to each other. Hallman did not retract his statement because he was mistakenly released from incarceration before making the retraction. Hallman was re-incarcerated at the time he testified at trial.
At the close of all the evidence, the trial court instructed the jury on the law applicable to Parks's case. The jury returned a verdict finding Parks guilty of four counts of capital murder as charged in the indictment. This appeal followed.
 I.
On appeal, Parks contends that the trial court erred when it failed to properly arraign him on the substituted indictment under which he was charged rather than the original indictment.
The record indicates that Parks was originally indicted on September 29, 2004. Represented by counsel, Parks executed a plea of not guilty and a waiver of arraignment on December 13, 2004. Although Parks had already entered a not-guilty plea on the indictment, he was brought before the trial court and formally arraigned on January 10, 2005. At that hearing, Parks entered a plea of not guilty on the original indictment. On March 9, 2005, the State filed a motion to quash the pending indictment and to substitute a new indictment handed down from the March 2005 session of the grand jury, on the ground that defects in the original indictment required a substitution of the new indictment and that the new indictment more accurately represented the true findings of the grand jury. The State's motion averred that the new indictment made no change to the rights or positions of the parties to the action. The State's motion to quash was granted by the trial court, and the new indictment was issued.
At trial, after six witnesses had testified, Parks moved the trial court to dismiss the case based on grounds that he was never arraigned on the substituted indictment. *Page 633 
In response, the trial court sent the jury to the deliberation room and arraigned Parks on the new four-count indictment. Each charge was read aloud in open court and Parks pleaded not guilty to all of the charges. The jury returned and the trial resumed to completion.
Our review of the actions of the trial court reveals no reversible error. Parks was brought before the court pursuant to Rule 14.1, Ala. R.Crim. P., for the charges raised in the original indictment. After the State filed a motion to quash the original indictment and to substitute a new indictment, the trial court substituted a second indictment. Parks did not object to the State's motion. Indeed, it was not until trial that Parks objected that he had not been properly arraigned on the supplemental indictment. At that point, the trial court promptly excused the jury and arraigned Parks on all the counts of the indictment.
This Court has held that arraignment, if not waived, may happen any time before trial; in fact, a defendant may be arraigned after the jury has been impaneled. Carroll v. State,445 So.2d 952 (Ala.Crim.App. 1983). A defendant waives arraignment if he does not timely object to not being arraigned. "`Even arraignment and plea can be waived by a defendant's failure to object to the lack thereof until after the jury has returned a verdict.'" Soriano v. State,527 So.2d 1367, 1372 (Ala.Crim.App. 1988) (quoting Smith v.State, 507 So.2d 579, 580 (Ala.Crim.App. 1987)). If a defendant brings it to the trial court's attention that he has not been arraigned, and the trial court fails to remedy the situation, this Court would be compelled to reverse the trial court's judgment and remand the case for a new trial.Benson v. State, 473 So.2d 1132 (Ala. 1985). See alsoHovater v. State, 552 So.2d 191 (Ala.Crim.App. 1989);McMurray v. State, 373 So.2d 872 (Ala.Crim.App. 1979);Pugh v. State, 343 So.2d 793 (Ala.Crim.App. 1977); andRorex v. State, 44 Ala.App.112, 203 So.2d 294 (1967). However, the record before us reveals that Parks was arraigned at the same proceeding in which the court was notified of its failure to arraign on the second indictment. That arraignment was proper and legally sufficient. Thus, Parks was properly arraigned on the charges upon which he was convicted. His claim to the contrary is without merit.
 II.
Parks contends that his convictions should be reversed because, he says, they are multiplicitous under the second indictment and violate his protections against double jeopardy. He contends that he was twice convicted of the same crime based on the defective indictment, that he was substantially prejudiced thereby, and that the trial court did not have subject-matter jurisdiction to convict him. Additionally, he argues that trial counsel's failure to object to the defective nature of the new indictment before trial constituted ineffective assistance of counsel.
"An indictment is multiplicitous if a single offense is charged in more than one count, thereby possibly prejudicing the defendant by suggesting that more than one offense had been committed." Dill v. State, 723 So.2d 787, 808
(Ala.Crim.App. 1998).
However, this Court has previously held:
 "A single transaction may give rise to the charging of multiple counts in an indictment when the purpose of charging multiple counts is to vary the description of the same offense in order to meet `every probable contingency of evidence' and not to convict the accused of all alternative counts contained in the indictment." *Page 634 
George v. State, 717 So.2d 827, 832
(Ala.Crim.App. 1996), reversed and remanded with directions,717 So.2d 844 (Ala. 1996), on remand, 717 So.2d 849 (Ala.Crim.App. 1997), aff d, 717 So.2d 858 (Ala. 1998).
The indictment contained in the record indicates that Parks was found guilty of two counts of burglary in the first degree and was sentenced to 20 years' imprisonment for each offense. Parks's indictment provides, in pertinent part:
 "COUNT 1
 "KEITH PARKS, whose name is otherwise known to the grand jury, did intentionally cause the death of another person, to-wit: Randall Gilliland, by shooting him, with a firearm, and did intentionally cause the death of another person, to-wit: James Davis, by shooting him, with a firearm, by one act or pursuant to one scheme or course of conduct, in violation of Section 13A-5-40(a)(10) of the Alabama Criminal Code,
 "COUNT 2
 "The Grand Jury of said county further charge that, before the finding of this indictment, KEITH PARKS, whose name is otherwise known to the Grand Jury, did intentionally cause the death of another person, to-wit: James Davis, by shooting him, with a firearm, and did intentionally cause the death of another person, to-wit: Randall Gilliland, by shooting him, with a firearm, by one act or pursuant to one scheme or course of conduct, in violation of Section 13A-5-40(a)(10) of the Alabama Criminal Code. . . ."
(R. 42.)
Specifically, he alleges that his constitutional protection against double jeopardy was violated when he was tried and convicted of counts one and two of his indictment for murder wherein two or more persons are murdered by one act or pursuant to one course or scheme of conduct when both counts reflect the murder of the same two people. We agree with his argument that counts one and two of his indictment represented the death of two persons committed by one act or course of conduct and merely reversed the order of the victim's names in each count. Therefore, Parks's conviction as to both of the counts cannot stand. However, Parks is not due a new trial; rather, this cause is affirmed in part and remanded for one of the convictions and sentences based on the alternative counts in the indictment to be vacated in order to satisfy due-process concerns. See, e.g., Hardy v. State, 920 So.2d 1117,1121-22 (Ala.Crim.App. 2005); Perkins v. State,897 So.2d 457, 461-62 (Ala.Crim.App. 2004).
For the reasons set forth above, the convictions on two alternative counts of murder of two or more people pursuant to one scheme or course of conduct cannot stand. Accordingly, this case must be remanded for the court to vacate the conviction and sentence as to count one or count two of the indictment. As will be discussed in greater detail, the remainder of Parks's convictions were proven and may stand. Accordingly, this case must be remanded for the trial court to enter an order that adjudges Parks guilty of only one count of the intentional murders of James Davis and Randall Gilliland pursuant to one scheme or course of conduct.
 III.
Parks next argues that his trial counsel rendered ineffective assistance because, he says, he was prejudiced by trial counsel's failure to object to what he says was improper prosecutorial misconduct. Specifically, Parks claims (1) that he was prejudiced by trial counsel's failure to object *Page 635 
when the prosecutor referred to Parks as a "liar" and a "murderer"; and (2) that he was prejudiced by trial counsel's failure to object when, during direct examination of a witness, the prosecutor referenced Parks's past incarceration. Further, Parks alleges that trial counsel failed to develop a proper time line of events to question whether it was remotely possible that Parks committed the offenses. Parks suggests that the handwritten statement taken by police was subject to error, misinterpretation, and inaccuracy and that trial counsel should have objected to its admission. Parks contends that trial counsel never attempted to obtain a copy of an October 15, 2003, arrest report detailing Parks's arrest for public intoxication, which was not disclosed in discovery and was not available for use to impeach the testimony of the arresting officer or other witnesses, and that counsel did not object to the unavailability of the report. Parks argues that, although that trial court gave an instruction on manslaughter, his trial counsel was ineffective because he failed to request that the trial court give a jury charge on the lesser-included offenses of felony murder or murder.
The record indicates that Parks was sentenced on August 31, 2006. On that same date, the trial court appointed the same counsel who had represented Parks at trial to represent Parks on appeal. On September 5, 2006, counsel filed a motion for a judgment of acquittal alleging issues relating to the sufficiency of the evidence, but he raised no claims of ineffective assistance of counsel. By the time counsel filed a motion to withdraw on November 7, 2006, and new counsel was appointed to represent Parks on appeal, it was too late for new appellate counsel to file a timely motion for a new trial alleging ineffective assistance of counsel.
This issue is not properly before this Court for appellate review. To preserve the claims of ineffective assistance for appellate review on direct appeal, counsel should have presented these claims to the trial court in a motion for a new trial. See Bracknell v. State, 883 So.2d 724
(Ala.Crim.App. 2003); Phillips v. State, 726 So.2d 292, 294
(Ala.Crim.App. 1998). Any claims of ineffective assistance of counsel must now be raised in the trial court by filing a petition for postconviction relief pursuant to Rule 32, Ala. R.Crim. P.
 IV.
Parks also argues that the trial court abused its discretion when it denied his motion for a judgment of acquittal and motion for a new trial because, he says, the State did not establish a prima facie case of capital murder.
 "`"In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution."' Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App. 1998), quoting Faircloth v. State, 471 So.2d 485, 488
(Ala.Crim.App. 1984), aff'd, 471 So.2d 493 (Ala. 1985). `"The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt."' Nunn v. State, 697 So.2d 497, 498 (Ala.Crim.App. 1997), quoting O'Neal v. State, 602 So.2d 462, 464
(Ala.Crim.App. 1992). `"When there is legal evidence from which the jury could, by fair inference, find the defendant guilty the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb *Page 636 
the trial court's decision."' Farrior v, State, 728 So.2d 691, 696 (Ala.Crim.App. 1998), quoting Ward v. State, 557 So.2d 848, 850
(Ala.Crim.App. 1990). `The role of appellate courts is not to say what the facts are. Our role . . . is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury.' Ex parte Bankston, 358 So.2d 1040, 1042
(Ala. 1978).
 "`The trial court's denial of a motion for judgment of acquittal must be reviewed by determining whether there was legal evidence before the jury at the time the motion was made from which the jury by fair inference could find the defendant guilty. Thomas v. State, 363 So.2d 1020 (Ala.Crim.App. 1978). In applying this standard, this court will determine only if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Crim.App. 1983). When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion for acquittal does not constitute error. McConnell v. State, 429 So.2d 662
(Ala.Crim.App. 1983)."
Gavin v. State, 891 So.2d 907, 974
(Ala.Crim.App. 2003) (quoting Ward v. State, 610 So.2d 1190,1191 (Ala.Crim.App. 1992)). See also Ward v. State,814 So.2d 899, 908-10 (Ala.Crim.App. 2000). In addition, it is not the place of an appellate court to invade the province of the jury and to reweigh evidence presented at trial. SeeZumbado v. State, 615 So.2d 1223, 1240-1241
(Ala.Crim.App. 1993).
Pursuant to §§ 13A-5-40(a)(10), Ala. Code 1975, the State was required to prove that "two or more persons [were] murdered by the defendant by one act or pursuant to one scheme or course of conduct." The evidence, when viewed in the light most favorable to the State, shows that on October 15, 2003, at around 11:00 a.m., Randall Gilliland picked up his friend, James Davis, and then Parks. He telephoned Parks earlier that day to see if he could come over and help him trim the combs of his fighting roosters. After the men left Parks's house, they drove to a McDonald's fast-food restaurant in Calera, where they met Gilliland's brother-in-law and collected a $50 check from him.
The men arrived before Gilliland's brother-in law, so they drank a six-pack of beer while they waited. After that six-pack was finished, the men bought more beer from a store across the street. When they returned to McDonald's, Gilliland's brother-in-law was waiting with the check. The three men then drove back to Montevallo and cashed the check at a bank.
En route to his house, Gilliland stopped again in Wilton and bought another case and a half of beer. Upon their arrival at Gilliland's house, the men drank more beer. Then they began trimming the roosters. At some point the men switched from drinking beer to drinking moonshine. They concluded trimming the roosters at around dusk.
At approximately 4:30 to 5:00 that same afternoon, Randall Lucas was clearing brush on his property, which is adjacent to Gilliland's property. Lucas heard several gunshots, a pause, then several more gun-shots. He estimated that he heard a total of four to five gunshots. Approximately 30 minutes later, as Lucas was leaving the property to go home, he saw a police car on Six Mile Bridge.
Kenneth Harbison was driving through the area of Six Mile Creek on the evening of October 15, 2003. As he passed Parks walking alongside the road, Parks swung something toward Harbison's truck. Harbison turned around in the road to confront Parks and saw him standing in the *Page 637 
middle of the bridge. Harbison testified that his grandparents were traveling over the bridge at that same moment, and he saw them swerve to avoid hitting Parks. When Harbison stopped to check on his grandparents, Parks attempted to get in Harbison's truck. Harbison tried to prevent Parks from entering the truck, and Parks put a shotgun to Harbison's abdomen and said "you've had it now." Harbison grabbed the shotgun and placed it on the hood of his truck. Harbison and Parks engaged in a physical scuffle, and Parks swung his fist at Harbison before Harbison could finally wrestle Parks to the ground, where he held Parks until police arrived.
The Bibb County Sheriffs Department received a 911 emergency call at 7:31 p.m. on October 15, 2003, which reported that a man was on the Six Mile Bridge waving a gun. Deputies were dispatched and arrived at the scene at about 7:51 p.m., and found Parks subdued on the ground. Parks, who had the smell of alcohol emanating from his person, was arrested and charged with public intoxication and reckless endangerment. In addition, Harbison signed a warrant against Parks for assault. Parks told deputies that he had been visiting at a friend's house. The deputies had to assist Parks into the patrol car.
On the morning of October 17, 2003, John Kish went to Gilliland's house because he thought it was peculiar that he had not heard from his friend in four days. When he arrived, Kish entered the house and saw Gilliland lying facedown in the living room with a handgun on the floor beside him. Kish knew that Gilliland was dead, and he immediately telephoned 911 for emergency assistance.
Kish had seen James Davis's wheelchair as he entered Gilliland's house, so he assumed Davis was at the house also. After he called 911, Kish walked down the hall to look for Davis. When he reached the bathroom, he discovered Davis leaning over the toilet with his head between the toilet and the bathtub. Kish knew it was Davis and knew that he was dead by the purple discolorations on his back.
The Bibb County Sheriffs Department responded within 20-30 minutes of Kish's 911 call. Upon their arrival, they discovered Gilliland lying in the living room and Davis slumped over the toilet in the bathroom. A short time later, the coroner arrived and pronounced Gilliland dead at 9:55 a.m. and pronounced Davis dead at 9:56 a.m. A ring of keys and an empty wallet were lying on the floor by Gilliland's body; papers and receipts from the wallet were strewn around the floor. Some glass had been broken out of a gun cabinet in a bedroom down the hallway. A roll of camouflage tape was found on the floor between the gun cabinet and the bed. The tape was similar to tape on the gunstock of the shotgun Parks had when he was arrested on Six Mile Bridge. A second ring of keys was found outside on the ground beside an automobile parked in Gilliland's yard. A piece of a broken key was retrieved from the ignition of the automobile.
Gilliland's autopsy was performed on October 20, 2003, and indicated that he had suffered two fatal gunshot wounds to the head. Both bullet fragments were recovered during the autopsy. In addition, Gilliland had suffered two sharp-force injuries — a stab wound to his upper left forearm and a cutting wound to his lower left forearm.
Davis's autopsy was also performed on October 20, 2003, and indicated that while Davis suffered three superficial gunshot wounds, his cause of death was a gunshot wound to the head. Two bullet fragments were collected during the autopsy. The medical examiner determined that Davis had been dead 24 to 36 hours at the time his body was discovered. *Page 638 
One of the deputies who responded to the murder scene had also been involved in Parks's arrest on October 15, 2003. He suggested to investigators that they should question Parks about his activities before he was arrested on Six Mile Bridge.
DNA analysis conducted on evidence recovered from the crime scene showed that the right shoe Parks was wearing the night he was arrested had Gilliland's blood on it. The forensic scientist testified that in her opinion the stain on Parks's shoe was made by either stepping into a large puddle of blood or from a large amount of blood falling onto the shoe. In her opinion, the blood came from a "free-flowing" wound.
Finally, Johnny Hallman testified that while he and Parks were assigned to the same cell in the jail, Parks confessed to murdering Gilliland and Davis.
Clearly, there was ample evidence to establish a prima facie case of capital murder and to submit the case to the jury for a determination of Parks's guilt. Accordingly, the trial court correctly denied Parks's motions for a judgment of acquittal.
Parks's two convictions for capital murder resulting from the robbery-murder of Gilliland and the robbery-murder of Davis are affirmed. However, for the reasons set forth in Part II of this opinion, Parks's convictions on two alternative counts of murder of two or more people pursuant to one scheme or course of conduct cannot stand. Accordingly, we remand this case to the circuit court with instructions that it vacate one of the aforementioned convictions. On remand, the court should take all necessary action to see that the circuit clerk makes due return to this Court at the earliest possible time and within 42 days of the release of this opinion.
AFFIRMED IN PART; REMANDED WITH DIRECTIONS.*
BASCHAB, P.J., and McMILLAN, SHAW, and WELCH, JJ., concur.
[1] Kish knew immediately that the body was characteristics. Both of Davis's legs had that of Davis because of his unique physical been amputated in a train accident.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[3] Although testimony revealed that the knives were taken from Parks, they were not inventoried in Parks's property bag at the jail.
* Note from the reporter of decisions: On January 25, 2008, on return to remand, the Court of Criminal Appeals affirmed, without opinion. *Page 1001